IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DONALD RAY PEVIA, JR.,                    *

Plaintiff                                 *

v                                         *          Civil Action No. ELH-11-3438

COLIN OTTEY, M.D., et al.,                *

Defendants                                *
                                        ***

## MEMORANDUM

Donald Ray Pevia, Jr., the self-represented plaintiff, is currently confined at the North Branch Correctional Institution ("NBCI"), a Maryland prison. In November 2011, he filed suit against defendants Colin Ottey, M.D. and Greg Flury, a physician's assistant,[1] pursuant to 42 U.S.C. § 1983, and under Maryland tort and constitutional law, "seeking redress for injuries suffered as a result of inadequate medical treatment." ECF 1.

Defendants are employed by a private contractor that provides health care services at NBCI.[2] Plaiantiff complains that defendants have failed to provide him with adequate medical care, despite his persistent pain stemming from a chronic shoulder injury, ECF 1 at 11, and his deteriorating medical condition. *Id.* at 12. *See also* Pevia Affidavit, ECF 1-1,¶¶ 16-20, 23. In support of his allegations, plaintiff appended to his complaint his own affidavit as well as the affidavits of several fellow inmates.[3]

---

[1] Plaintiff has misspelled the name as "Flurry." The Clerk is directed to correct the spelling on the docket.

[2] Plaintiff sued defendants in their individual capacities, claiming they acted "under color of State law." ECF 1 at 2.

[3] The affiants include Ronnie Wimbush, Bruce Koenig, Myron Johnson, and Pablo Lancaster, who complain generally about the inadequate medical care at NBCI. All of these

Defendants have filed a "Motion To Dismiss," ECF 19, to which they have attached plaintiff's medical record, in excess of 200 pages. *See* ECF 19-2, Ex. 1.[4]  Plaintiff has responded and also moved for summary judgment. *See* ECF 24, 25, 26, 27, 28, & 31.[5]  Defendants have filed a reply.  ECF 29.  Upon review of the submissions, no hearing is necessary to resolve this matter. *See* Local Rule 105.6.

Factual Background

Plaintiff alleges that he suffered an injury to his left shoulder and scapula in 1998, resulting in "gradual loss of strength and range of motion for that shoulder; and gradually increasing pain in both the shoulder and scapula areas, with each passing year." ECF 1 at 3.  He claims that in July 2011, while incarcerated at Roxbury Correctional Institution ("RCI"), Physician's Assistant ("PA") Crystal Swecker "thoroughly examined" his left shoulder and scapula. *Id.* at 3.

Further, plaintiff asserts that, while housed at RCI, he had a medical order that provided for handcuffing with two sets of handcuffs whenever he was to be handcuffed behind his back. He claims that the order was entered due to his left shoulder injury and his physical size, 6'4" and 290 lbs.  Plaintiff also states that, while housed at RCI, he had a medical order for bottom bunk status. *Id.*  According to plaintiff, x-rays were taken while he was held at RCI, and he "was

---

affidavits appear collectively on the docket as "Affidavit," ECF 1-1.  Plaintiff later filed a Declaration of Eugene Jones and an Affidavit of Cravon Brown. *See* ECF 26.  Mr. Jones denies that he was involved in an altercation with plaintiff, and Mr. Brown attests to plaintiff's extreme shoulder pain.

[4] The motion was filed in July 2012.  The medical records pertain to the approximate period of July 2011 through May 2012, and reflect care by numerous health care providers.

[5] Plaintiff's supplemental responses in opposition to the defendants' motion were docketed as a Declaration, Correspondence, and Motion to Amend Additional Evidence of Defendants, respectively. *See* ECF 26, 27, 28.  Each of plaintiff's filings has been considered by the court as part of his opposition to defendants' dispositive motion and in support of his own motion for summary judgment.

advised that due to the injury in 1998, the tendons, ligaments, and muscles in [his] left shoulder were torn, and that stretching of the tendons and ligaments had never been corrected." Pevia Affidavit, ECF 1-1, at ¶ 8.  Further, Pevia avers that the PA advised him that "sharp calculi had formed around the rim of [his] shoulder socket," Pevia Affidavit, ECF 1-1, ¶ 9, and that he had "significant arthritis."  ECF 1 at 3.  Plaintiff avers: "It was acknowledged that an MRI would be necessary in order to fully define the extent and the severity of the damage to [his] shoulder and scapula."  Pevia Affidavit, ECF 1-1, ¶ 10.  Plaintiff notes that a steroid injection to his left shoulder was recommended first, in order to reduce inflammation and to "help determine the need for the MRI, and perhaps, for corrective surgery."  *Id*.  Although the steroid injection to plaintiff's left shoulder was prescribed, plaintiff explains that, on October 13, 2011, he was transferred to NBCI, and had not yet received the injection.  ECF 1 at 4.

According to plaintiff, because of his transfer to NBCI, his medical records were sent to the institution, including the orders for the steroid injection and the cuffing procedure.  *Id.*  Yet, plaintiff was advised by NBCI staff that his medical orders from RCI would not be honored. Instead, he would have to "start all over with regard to those previously-recognized medical needs."  *Id*.

According to plaintiff, he was subjected to "excruciating pain in his injured left shoulder and scapula, when defendants temporarily rescinded the double-cuff order."  *Id.* at 5.  Further, he alleges that, without even examining plaintiff, Flury "arbitrarily" cancelled the steroid injection. *Id.*  Plaintiff states that during his medical exam on October 18, 2011, Flury explained that he had cancelled the steroid injection because the staff at RCI "don't know what they're talking about."  *Id*.  Instead, Flury prescribed exercises, which plaintiff found too difficult to perform. Pevia Affidavit, ECF 1-1, ¶ 16.  *See also* defendants' Ex. 1 at 24-26.  When Flury examined

plaintiff on October 18, 2011, he reinstated the double cuffing order, but only for 90 days.  ECF 1 at 6.  However, Flury failed to provide plaintiff with a copy of the order to show to security staff until November 29, 2011.  *Id.*  During this time, plaintiff states he was repeatedly forced to submit to single cuffing behind his back, causing excruciating pain and further injury to his shoulder.  *Id.*

Plaintiff complains that since he has been under defendants' care he has "experienced a dramatic loss of strength in his left shoulder; a sharp increase in generalized pain in both his left shoulder and scapula; loss of range of motion for that shoulder; and [he] finds himself subconsciously holding his left arm as if it were in a sling."  *Id*. at 6-7.  He also states that because the order for bottom bunk status was not renewed, he fell and was injured on November 4, 2011, while dismounting his top bunk.  *Id.* at 7.  He also alleges that the staff at NBCI did not always provide him with needed pain medication.  *Id*. at 11.  And, he claims that defendants have unnecessarily delayed or postponed diagnostic procedures "for purely financial reasons."  *Id.*

According to plaintiff, the conduct of Flury and Ottey is not limited to him.  He maintains that Ottey regularly fails to see patients and Flury regularly cancels medical care prescribed by other health care providers.  *Id.* at 7-8.  Plaintiff alleges that the conduct of Ottey and Flury is part of a "pattern and practice [of denying medical care] that has existed at NBCI since at least 2008."  *Id*. at 8.        Plaintiff's medical records, submitted by defendants, demonstrate that on or about September 11, 2011, while plaintiff was housed at RCI, he was examined by Teresa Folk, LPN, for complaints of left shoulder pain.  Plaintiff told Folk that, while housed at the Carroll County Detention Center, he got in a fight and "tore [his] shoulder up."  ECF 19-2 at 2.  He reported that he had an MRI, which indicated all the ligaments were torn but the jail would

not pay for treatment.   Plaintiff was prescribed Motrin for pain relief, referred for further evaluation, and advised to return to sick call if his pain did not improve.  ECF 19, Ex. 1 at 2-3.

Plaintiff was evaluated by PA Swecker on September 14, 2011.  She noted that upon physical examination plaintiff demonstrated "limited cooperation with ROM evaluation as pt reports that he is unable to use his shoulder.  PT also resisted passive ROM evaluation.  Pt with excessive pain response to light palpation.  No musculature atrophy noted."  A muscle spasm was noted to the lateral scapular border.  Naproxen, methocarbanol, Medrol, and Motrin were prescribed, and an x-ray was ordered.  *Id.* at 9-11.

An x-ray of plaintiff's left shoulder was taken on September 22, 2011.  It revealed "degenerative changes with osteophyte formation likely from trauma to left shoulder."  *Id.* at 11. Teresa Folk, LPN, evaluated plaintiff on September 28, 2011.  According to Folk, plaintiff advised that he had been taking the prescribed medications, including the steroid, but felt no difference.  It was noted that plaintiff continued to guard his right arm and had tenderness to palpation of the left shoulder.  The prescriptions for Naproxen and Methocarbamol were continued.  *Id.* at 13.

Plaintiff was involved in an altercation on September 30, 2011, but refused treatment.  *Id.* at 15.  On October 10, 2011, plaintiff was evaluated by PA Swecker for follow up regarding his left shoulder pain.  Plaintiff reported that his shoulder "locks up on me on occasion…."  *Id.* at 17. As a result of the x-ray findings, he was prescribed Glucosamine Chondroitin and a steroid injection of Kenalog-40s.  Swecker noted during this exam that "x-ray shows osteophytes and DJD [degenerative joint disease], but i[t] was observed on video tape of patient grabbing another person from behind and using both hands to cut pt's neck and head.  Pt appeared to have an excellent ROM at that time."  *Id.*

On October 13, 2011, after plaintiff's transfer to NBCI, plaintiff filed a sick call request asking for an order to be double cuffed. *Id*. at 22. On October 14, 2011, plaintiff refused his prescription for Robaxin. *Id*. at 23. Plaintiff was evaluated for his chronic left shoulder pain by PA Greg Flury on October 18, 2011, *i.e.*, within days of his transfer to NBCI. *Id.* at 24. According to Flury, plaintiff advised that he had dislocated his left shoulder in the 1990s. Mr. Pevia recounted that a nurse advised him in 2010 that he had sustained a "torn rotator cuff." After reviewing plaintiff's record, Flury noted that plaintiff's shoulder injury was last evaluated on October 10, 2011, when he was at RCI. It was then reported that the x-rays showed osteophytes and degenerative joint disease. However, Flury also noted the prior observation that plaintiff appeared to have an excellent range of motion. In addition, he referred to a note of 9/14/11, indicating that plaintiff advised medical staff that he had an MRI while he was in county detention, which showed torn ligaments and muscles in his arm, but the county would not pay for his treatment. Flury questioned plaintiff about the MRI, and plaintiff advised Flury that the note was a mistake, as he "never had an MRI." *Id*.

An order was completed to allow plaintiff to be double cuffed behind the back for 90 days. *Id.* at 27. In addition, the steroid injection was removed from plaintiff's course of treatment; Naproxen was prescribed; and plaintiff was "educated/encouraged" to do "daily ROM/stretching exercises." *Id.* at 25-26.

Plaintiff was scheduled for a follow up on October 25, 2011, but he refused to come to the medical department. *Id*. at 30. He signed a release of responsibility ("ROR") declining his prescription for Robaxin on October 14, 2011, and October 27, 2011. *Id*. at 23, 31.

On November 3, 2011, plaintiff filed a sick call slip regarding pain in his left shoulder. *Id*. at 33. He noted it was his "Eighth Request for Treatment." *Id*. He also filed a sick call slip

on November 6, 2011, indicating he fell from his top bunk and, as a result of the fall, he "jammed" his shoulder and twisted his foot. *Id*. at 35. Plaintiff was scheduled to be seen in the medical clinic on November 14, 2011. But, at the request of Flury, the appointment was rescheduled due to a "behavioral disturbance on the tier." *Id*. at 35-37.

Plaintiff filed a sick call slip on November 30, 2011, requesting front cuff status, indicating that due to his shoulder injury it was painful to put his arms behind his back, even when using double cuffs. *Id*. at 38. On December 7, 2011, plaintiff refused to attend his medical appointment. *Id*. at 39, 41-42.

On January 2, 2012, plaintiff was involved in a "possible altercation," in which he suffered a contusion to his left shoulder and scratches. Although plaintiff reported not knowing how his injuries occurred, multiple scratches were noted. No other complaints were voiced. *Id*. at 43-44.

Plaintiff was evaluated by Flury on January 11, 2012, in response to a sick call slip dated January 8, 2012, indicating his "shoulder is in terrible pain," and requesting a "permanent front cuff order." *Id*. at 45. As a result of the examination, plaintiff was prescribed Motrin for pain relief, the order to be double cuffed was discontinued, and an order for 3-piece cuffs for 30 days was entered. Flury also ordered x-rays. *Id*. at 46-48.

An x-ray of plaintiff's shoulder was performed on January 17, 2012. *Id*. at 49. It revealed "chronic post traumatic degenerative changes seen at shoulder joint." *Id*. Plaintiff submitted another sick call slip on January 29, 2012, requesting information as to the results of the x-ray and again asking for a front-cuff order. *Id*. at 50. Plaintiff was evaluated on February 1, 2012, by PA Katie Winner. Winner also entered an order returning plaintiff to double cuff status. An order for double cuffing for six months was generated. *Id*. at 53-55.

Plaintiff was again seen in the medical department on February 9, 2012, in response to a sick call slip requesting pain medication.  As a result, his prescription for Motrin was renewed. *Id*. at 56.  On February 15, 2012, plaintiff again filed a sick call slip requesting a front-cuff order. *Id*. at 60.  The following day, Winner entered an order permitting front cuffing for six months. *Id.* at 61-63.   On February 16, 2012, plaintiff refused to come for a scheduled sick call appointment with a nurse.  *Id*. at 59, 64.

On February 27, 2012, plaintiff submitted a sick call slip requesting pain medication for his shoulder condition.  *Id*. at 65.  He was seen on March 1, 2012.  *Id*. at 65-67, 127-28. Although plaintiff indicated the Ibuprofen was working to relieve his pain, the medical provider switched plaintiff to aspirin because he was positive for Hepatitis C.  *Id*.  The prescription for aspirin was renewed on April 12, 2012, and extended through July 12, 2012.  *Id*. at 141.

Plaintiff submitted a sick call slip on March 3, 2012, complaining of left shoulder pain and requesting an MRI.  He added: "I'm pretty sure my rotator cuff is <u>ripped</u> and extensive muscle and nerve damage down my bi-cep from my shoulder."  *Id*. at 69.  A notation was made on the form, as follows:  "Already addressed 3/1/2012."  *Id*.

Plaintiff filed another sick call request on March 9, 2012.  *Id*. at 70.  He noted that he wanted to discuss an MRI because of his shoulder pain, and requested "better medication."  *Id*. He was evaluated on March 5, 2012, and it was noted that an MRI had not been ordered.  *Id*. at 70-72, 129.

On March 9, 2012, plaintiff requested another sick call, along with an MRI.  *Id*. at 187. He was evaluated on March 13, 2012.  *Id*. at 130-31.  It was noted that he had limited range of motion due to pain and that he was requesting an MRI.  His pain medications, including Motrin, were continued.  *Id*.

Plaintiff completed an "Emergency Sick Call" on March 20, 2012, asking to see Dr. Ottey, not a nurse or a PA. *Id*. at 185. However, on that date plaintiff was seen by an RN, Kristi Cortez. *Id*. at 132. Aspirin and Twinrix were prescribed, along with heat and ice. *Id*. at 132-33.

On March 29, 2012, plaintiff was evaluated by PA Winner, who noted in chart review that "pt was sent to Johns Hopkins from RCI and MRI was completed of L shoulder, chest, and hand." She also noted: "Pt. chart was pulled for MRI done in 2009, which shows no tissue or muscle damage." *Id*. at 137. *See also id*. at 150.

Plaintiff has submitted documentation to support his claim that he never had an MRI in 2009, despite the medical notations referenced above. He insists that the only MRI performed upon him occurred at Johns Hopkins Hospital in July 2001, while he was in the custody of the Carroll County Detention Center. *See* ECF 28. That MRI report is included in the record. Notably, it revealed "soft tissue swelling" but "no other significant abnormality." *Id.*

In their Reply, ECF 29, defendants seem to concede the 2009 date of the MRI in plaintiff's record may be an error of transcription on plaintiff's medical chart, but claim that the date of the MRI is not significant. Defendants argue that, "whether [the MRI was] in 2001 or 2009 or both," the "shoulder injury" was "seen on an MRI . . . and no tissue or muscle damage was noted. . . ." ECF 29, at 6.

Dr. Ottey examined plaintiff on April 18, 2012, primarily for his hepatitis. ECF 19-2, Ex. 1 at 147-8. On that same date, plaintiff was seen by PA Winner in regard to his shoulder. *Id*. at 150. Winner requested physical therapy for plaintiff.[6] *Id*. at 150-151. However, physical therapy was not approved. *Id*. at 149.

---

[6] At that time, Wexford provided utilization review services and Corizon medical providers were required to seek approval for specialty services through Wexford.

On May 16, 2012, plaintiff completed an "Emergency Sick Call," asking Dr. Ottey when he would be starting his physical therapy and have his MRI. *Id*. at 180. On May 23, 2012, Mr. Pevia sought to renew his medication. *Id*. at 178. On May 30, 2012, he submitted another sick call request for his shoulder pain. *Id*. at 177.

### Non-Dispositive Motions

Plaintiff has filed a second motion for appointment of counsel. ECF 23. Under 28 U.S.C. § 1915(e)(1), a court of the United States may request an attorney to represent any person who is unable to afford counsel. But, as plaintiff has previously been advised, a federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264 (5th Cir. 1982). The question of whether such circumstances exist in a particular case hinges on the characteristics of the claim and the litigant. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984). Where a colorable claim exists but the litigant has no capacity to present it, counsel should be appointed. *Id*.

Here, plaintiff claims that he was denied adequate medical care. Upon careful consideration of the motions and various submissions by plaintiff, the court finds that plaintiff has demonstrated an impressive ability to articulate the legal and factual basis of his claims. Indeed, plaintiff's submissions are quite detailed, entirely legible, and very cogently presented. He has also demonstrated his understanding of the process by submitting several affidavits, including his own, to substantiate his claim that he has received inadequate medical care, and to buttress his claim of a pattern and practice of poor medical care at the prison. Moreover, the issues pending before the court are not unduly complicated. Because there are no exceptional

circumstances that would warrant the appointment of an attorney to represent plaintiff under §1915(e)(1), I shall deny that motion.

Plaintiff has also filed a "Motion for Court Order to Defendants for an MRI."  ECF 25. He contends that the MRI that defendants claimed was performed upon him in July 2009, while he was at RCI, could not have been done by Corizon, as he was not an inmate at RCI at that time. Instead, he claims that he was housed in the Carroll County Detention Center from June 9, 2009 to July 6, 2012.  Further, Mr. Pevia seeks to have an MRI performed on his left shoulder, collar bone, and bicep, to check for "ripped" muscles, tendons, and ligaments.  ECF 25.

Previously, plaintiff unsuccessfully sought a preliminary injunction requiring defendants to provide him with an outside medical consultant and whatever medical care the consultant required.  ECF 3.  Plaintiff was advised that a preliminary injunction temporarily affords certain relief prior to trial, and that the party seeking the preliminary injunction must demonstrate: (1) by a "clear showing" that he is likely to succeed on the merits at trial; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20-23 (2008); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 292-93 (4th Cir. 2011).

Plaintiff's renewed request for injunctive relief shall be denied, as he does not clearly establish that he would suffer immediate and irreparable injury, loss, or damage if the requested MRI is not granted.  Put another way, the conditions articulated by plaintiff do not warrant immediate emergency relief.

**Standard of Review**

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6)  and accompanied by exhibits, including plaintiff's voluminous medical record.  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  But, a motion presented in the manner of this one implicates the court's discretion under F. R. Civ. P. 12(d) to consider matters outside of the pleadings.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion [to S. J.], or to reject it or simply not consider it."  5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.).  But, this discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id.* at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.* at 165-67.

If the court determines to consider extraneous material, Rule 12(d) provides that "the motion must be treated as one for summary judgment under Rule 56."  In that event, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  Moreover, a court may not convert a motion to dismiss to one for summary judgment, unless it first gives notice to the parties that it will do so.  *See Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes"

in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Fisher v. Md. Dept. of Pub. Safety & Corr. Servs.*, Civ. No. JFM-10-0206, 2010 WL 2732334, at *3, 2010 U.S. Dist. LEXIS 68772, at *8-10 (D. Md. July 8, 2010).

Here, plaintiff was provided with the notice required by *Roseboro v. Garrison*, 528 F.2d. 309 (4th Cir. 1975). In particular, he was informed that defendants had filed a motion to dismiss or for summary judgment. He was also advised that, if the motion is granted, it could result in dismissal of his case. And, in bold letters, he was told that he was entitled to file an opposition response, with materials in support thereof. *See* ECF 21. To that end, plaintiff filed several responses. *See* ECF 24, 25, 26, 27, 28, 31.

I am mindful that, ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont*, *supra*, 637 F.3d at 448-49. However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45

(discussing affidavit requirement of former Rule 56(f)).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, and fails to file a Rule 56(d) affidavit, he acts at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods,* 302 F.3d at 244 (citations omitted).  On the other hand, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.  Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted).

Plaintiff has not filed an affidavit under Rule 56(d).  To the contrary, he has submitted several affidavits and other documentary evidence in support of his motion, and in opposition to defendants' motion.  Perhaps most significant, the defense has submitted plaintiff's extensive medical record for the relevant period.  I am amply satisfied that it is appropriate to address the defendants' motion as one for summary judgment.

Summary Judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court

has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247-48 (1986) (emphasis in original).

In resolving the motion, the court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644-45 (4th Cir. 2002). However, "[t]he party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). Because plaintiff is self-represented, however, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nevertheless, the court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Discussion

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of a federal constitutional right or a right secured by federal law. *See Baker v. McCollan*, 443 U.S. 137 (1979). Plaintiff has alleged various constitutional violations, including a claim under the Eighth

Amendment.[7]  It prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).

To state an Eighth Amendment claim under § 1983 based on a denial of adequate medical care, plaintiff must demonstrate that the actions of defendants, or their failure to act, amounted to deliberate indifference to an inmate's serious medical need.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).   Deliberate indifference to a serious medical need requires proof that, objectively, plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available.  *See Farmer v. Brennan*, 511 U.S. at 837.

As noted above, the medical condition at issue must be serious.   A "serious medical need" refers to a medical need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Iko*, 535 F.3d at 241 (citing *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).   Proof of an objectively serious medical condition, however, does not end the inquiry.   The second component of proof requires "subjective recklessness" in the face of the serious medical condition.  *Farmer*, 511 U.S. at 839.

Deliberate indifference to a serious medical need "describes a state of mind more blameworthy than negligence."  *Id.* at 835.  It requires proof that the prison official knew of or was aware of the inmate's need for medical attention and disregarded an excessive risk to the inmate's health or safety.  *Id.* at 837.  Put another way, for liability to attach based on a violation of the Eighth Amendment, the law "requires consciousness of a risk. . . ."  *Id.* at 840.  The Fourth

_____

[7] All of plaintiff's claims relate to his contention that he received inadequate medical care.

16

Circuit has explained: "Actual knowledge or awareness on the part of the alleged inflicter…becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

In *Farmer,* the Supreme Court rejected an objective test for deliberate indifference. *Id.* at 837; *see Wilson v. Seiter,* 501 U.S. 294, 303 (1991). The *Farmer* Court held that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. The *Farmer* Court added that it is enough for an Eighth Amendment claimant to show that "the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).

Under § 1983, individual liability must be based on personal conduct. *See Wright v. Collins,* 766 F.2d 841, 850 (4th Cir. 1985); *see also Foote v. Spiegal*, 118 F.3d 1416, 1423 (110th Cir. 1997). And, absent subjective knowledge, a prison official is not liable. *Farmer*, 511 U.S. at 847; *see Johnson v. Quinones,* 145 F.3d 164, 168 (4th Cir. 1998).

Even if the requisite subjective knowledge is established, a prison official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Under the Eighth Amendment, "[a] prison official's duty . . . is to ensure "'reasonable safety' . . ." (citation omitted). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d

383, 390 (4th Cir. 2001) (*citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Notably, inmates do not have a constitutional right to the treatment of their choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Disagreements between medical staff and an inmate over the necessity for or the extent of medical treatment do not rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins, supra,* 766 F.2d at 849; *see also Fleming v. LeFevere*, 423 F.Supp. 2d 1064, 1070-71 (C.D. Cal. 2006). Thus, "[d]isagreements between an inmate and a physician over the inmate's proper care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright*, 766 F.2d at 849; *see Estelle*, 429 U.S. at 105-06; *Fleming*, 423 F. Supp. 2d at 1070-71.

Plaintiff's allegation that he was not provided necessary medical treatment for his left shoulder injury is belied by the exhaustive medical record, which establishes that plaintiff was evaluated repeatedly and promptly in response to his complaints.  He received multiple x-rays, a diagnosis was made, exercises were suggested, and medications were prescribed and administered.  Additionally, plaintiff was provided medical orders to be double cuffed, triple cuffed, or cuffed in front.  There is no evidence that plaintiff sought bottom bunk status at NBCI or that his medical condition required it.  Although plaintiff claims that he needed and continues to need an MRI, plaintiff's disagreement with a course of treatment does not provide the framework for a federal civil rights complaint.  *See Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).

To be sure, the court does **not** minimize the gravity of plaintiff's shoulder injury.  Nor do

I suggest that plaintiff does not require medical care and treatment.[8]  But, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).  And, as observed earlier, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged."  *Wright v. Collins*, *supra*, 766 F.2d at 849 (citing *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir. 1970)).

In my view, the discrepancy in the date of the MRI is a red herring in the context of this case.  Whether the MRI was performed in 2001, while plaintiff was incarcerated at the Carroll County Detention Center, or in 2009, while in State custody, is not dispositive.  It is the information gleaned from the MRI, among other matters, that is significant.  As noted, the MRI did not reveal tissue or muscle damage.  It showed "soft tissue swelling" but "no other significant abnormality."  *See* ECF 28.  Further, the record establishes that plaintiff has been evaluated repeatedly while in State custody, and has been provided with x-rays as well as medications.  As of his last evaluation, there was no indication that any additional treatment or testing was required.

At best, the allegation concerning defendants' inappropriate treatment states a claim of medical malpractice and negligence.[9]  But, "an inadvertent failure to provide adequate medical care does not amount to deliberate indifference."  *Estelle*, *supra*, 429 U.S. at 105.  Put another

---

[8] The persistence or worsening of plaintiff's condition might warrant further evaluation, treatment, and/or more aggressive intervention.  But, the court cannot predict the future.

[9] Under Maryland law, a claim of medical malpractice may proceed in state or federal court only after review before the Maryland Health Claims Alternative Dispute Resolution Office.  *See* Md. Code, Cts & Jud. Proc., §3-2A-01 *et seq*.; *see also Davison v. Sinai Hospital of Balt. Inc*, 462 F.Supp. 778, 779-81 (D. Md. 1978); *Carroll v. Konits*, 400 Md. 167, 172 (2007).  There is no demonstration that plaintiff has sought or completed such review.

way, mere negligence or medical malpractice does not rise to a constitutional level. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986).

For all the reasons stated above, defendants are entitled to summary judgment as to plaintiff's federal constitutional claims. Plaintiff's motion for summary judgment is denied. And, this court declines to exercise supplemental jurisdiction over any state law claims. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs,* 383 U. S. 715, 726 (1966). A separate Order shall be entered in accordance with this Memorandum.


February 15, 2013                           /s/_____
Date                                        Ellen Lipton Hollander
                                            United States District Judge